Filed 4/29/22  P. v. Cruz CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL ANGEL PINEDA CRUZ,<br><br>Defendant and Appellant. | C092435<br><br>(Super. Ct. Nos. 18FE001971, 18FE003593) |

A jury convicted defendant Miguel Angel Pineda Cruz of two counts of criminal threats, and one count each of assault with a firearm, domestic violence, possession of a firearm by a felon, and methamphetamine possession.  (Pen. Code, §§ 422, 245, subd. (b), 273.5, subd. (a), 29800, subd. (a)(1); Health & Saf. Code, § 11377, subd. (a).)[1]  The jury found true that defendant personally used a firearm in the assault and in one criminal threat incident.  (§ 12022.5, subd. (a).)

---

[1]  All undesignated statutory references are to the Penal Code.

1

Defendant contends that: (1) the trial court erred in admitting evidence of prior uncharged acts of domestic violence against the victim, Maria E., under Evidence Code section 1109;[2] (2) the court improperly admitted unauthenticated text messages in violation of the hearsay rule; (3) the evidence was insufficient to support the jury's verdict on the firearm possession count; and (4) the cumulative effect of these claimed errors violated due process.

We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was Maria E.'s partner for 13 years. They have two children. They lived together since the first child was born but never married.

Defendant consumed a lot of alcohol. He would drink all the time. Throughout their relationship, defendant would call Maria E. derogatory names, in public and in front of their children.

Defendant would get upset when things were not done the way he liked, when he liked. Defendant was a controlling person. Maria E. referred to him as "El Patron," meaning a person who orders other people around.

In recent years, defendant had become violent. In September 2016, defendant became even more violent. Maria E. believed he was taking drugs.

In the last few years, defendant frequently had guns. He carried one or two guns almost all the time.

*November 2017 text messages*

By November 3, 2017, Maria E. decided she could no longer stay with defendant and left him. During the month of November 2017, defendant tried to get Maria E. to come back. Defendant sent text messages threatening to kill Maria E. and members of

---

[2] We refer to the victim by her first name and last initial. (Cal. Rules of Court, rule 8.90(b)(4).)

her family.  Maria E. was afraid.  She believed defendant's threats; because of the drugs it could be possible he would do these things.

Maria E. provided the police a packet of screenshots of text messages she received from defendant.  She sent them to the police because she felt her life was being threatened and defendant was capable of carrying out his threats.  Maria E. first called police to report that defendant was sending her threatening text messages and met with an officer on November 22, 2017.  On January 22, 2018, Detective Nicole Sunseri called Maria E. to follow up and obtain the messages.  At the time, Maria E. told Sunseri that she did not want to go forward with prosecution and did not send any of the text messages.  Maria E. did not send the messages to police until February 8, 2018, after an incident with defendant on January 30, 2018, described below.

A text message on page 3 of the packet was incoherent and referred to stories in the Bible where death was involved.[3]  Messages like this led Maria E. to believe that defendant was becoming more violent and might also be under the influence of drugs.

At the top of page 4 were the letters "M-I-G," which was a contact for defendant in Maria E.'s phone.  The packet of texts contained messages from several telephone numbers.  Maria E. would block defendant's numbers and he would send messages from different numbers.

In a text message on page 4, defendant said it was not going to be easy for Maria E. if she left the country, which she understood to mean she would not be safe in Mexico.  In a text message on page five, defendant told Maria E. to talk to him before she left because he was going to do what he previously said he was going to do.  Defendant had said he was going to go to Mexico to kill Maria E.'s father, mother and brothers.  At the

---

[3] Maria E. testified in Spanish through an interpreter.  The messages were in Spanish. Maria E. testified without objection as to her understanding of the messages, not necessarily their literal translation.

end of the message, defendant said that even though he loved his children, he would not look for them, and if they did not look for him, he would send them where he was going to send Maria E. "to eat shit for being dumb asses."

At the top of page 6 of the text messages from a contact labeled "El Patron," defendant told Maria E. he was going to send someone to hurt her family and asked which of her brothers to start with. Maria E. believed that defendant was capable of sending someone to harm her brothers. On a page 7 from a contact labeled "Miguel Cruz," defendant said if Maria E. did not do what he wanted her to do, she would have a "lot of pain in my heart," which she understood to mean she would suffer if she did not obey him. Defendant said he was becoming the devil because of her. On page 8, defendant said he had run out of patience and Maria E. was going to suffer the death of others. Maria E. understood this to mean defendant would kill someone close to her. Defendant told Maria E. to go "fuck yourself."

On page 9 of the text messages was a photo of guns and alcohol. Defendant had threatened Maria E. with the guns and made her do things she did not want to do. Maria E. took this message to mean that defendant "kept going with the same threat." On page 10, defendant texted that he wanted Maria E. to avoid suffering and pain, so she should come home.

The packet contained screenshots of text messages from Elizabeth, a friend of Maria E.'s that defendant met through her. Elizabeth would send Maria E. messages that Elizabeth received from defendant. A text on page 11 said that because Maria E. would not talk to defendant, they were "going to leave from here and nine others of your family," which she took to mean defendant would kill her and maybe himself, but first kill nine of her family members. On page 12, Elizabeth told Maria E. that defendant said all he had to do was place the order to have her killed. On page 13 was a text message from defendant that what happened between them only death could resolve, which Maria E. understood to mean defendant would kill both of them or just her. On page 14,

4

Elizabeth forwarded a message from defendant to Maria E. that if she didn't want to go back to him that there was no place in the world she could go that defendant's "will" would not be "fulfilled." Maria E. understood defendant's "will" to be his intention to kill her.

*January 30, 2018 incident*

On January 30, 2018, Maria E. went to defendant's house with a friend to pick up Maria E.'s belongings and those of her children. Maria E. knocked on the door but defendant didn't answer and she used a key she had to open the door. When Maria E. and her friend went inside, defendant came out of his room and asked what Maria E. was doing there. Defendant seemed upset. When Maria E. told him she was there to collect some belongings, defendant said, "[t]hat's fine," and walked towards the kitchen.

Maria E. went into the children's room. She was picking things up when defendant came up behind her with a gun in his hand. Maria E. turned around and saw defendant coming towards her pointing the gun at her head. Defendant said the "best thing is for me to kill you," and cocked the gun by sliding the top of the gun back. Defendant walked towards Maria E. and rammed the tip of the gun into her forehead. Defendant turned towards the door and Maria E.'s friend was there. Defendant walked towards the friend pointing the gun at her chest and told her if she didn't leave the house that "he was going to fucking kill her, as well." Maria E. took advantage of the moment while defendant was distracted to push her friend in front of her and they left. They drove to a gas station and called the police.

Police officers responded, arrested defendant, and searched the house with his consent. In a garbage can in the back, an officer found a box with a picture of a holster on it. Defendant said he found the box in the front yard of the house. Inside the house in the kitchen, deputies found a plastic bag containing methamphetamine.

The house was rented. The owners had a detached garage behind the house. The rental agreement did not give defendant and Maria E. access to the garage. Both Maria

5

E. and defendant went inside the garage, but only defendant went there when the owners were not present. He did not go in frequently.

The side door to the garage was unlocked. In the search of the garage, a police dog pulled a bag out a of wood pile. The bag contained a Glock handgun in a holster that matched the picture on the box and several loaded magazines, including one in the gun.

When shown the gun, Maria E. testified she believed, but was not sure, that it was the gun defendant pointed at her and used to strike her in the head. A sheriff's deputy testified that the gun found in the garage looked like a gun in the photo texted to Maria E., but he couldn't be certain.

*Defense Case*

Maria Rivas owned the house Maria E. and defendant rented. Rivas and her husband did not rent the garage; they used it for storage. The garage door and the side door were supposed to be locked. Rivas and her husband did not own guns or keep guns in the garage. If a gun was found in the garage, it did not belong to Rivas or her husband.

Defendant testified. Defendant worked for a construction framing company and met Maria E. at a restaurant where she worked. They dated for five months and then moved in together. They have two children aged 12 and 14. They were together for 13 years. It was not a good relationship. They did not have a great or mutual love for each other. They moved in together after Maria E. got pregnant with their first son. They broke up when Maria E. was pregnant with their second son, but then got back together.

On January 30, 2018, defendant and Maria E. had been separated about three months and defendant was living in the house they rented. She had contacted him a week and a half before about picking up her stuff on the weekend. January 30 was not a weekend day.

When Maria E. arrived on January 30, defendant was in the children's room. Defendant was going to look for a job with a friend, Samuel, who defendant told to wait outside while he changed clothes. When Maria E. opened the door without knocking,

6

defendant asked if she was looking for trouble, because she had a restraining order against him. Maria E. said she was there to pick up some things and defendant said, fine. Maria E. then said her new place was much smaller and asked if defendant would give her the house to live in with the children. Defendant said he would pay the rent only if Maria E. and the children were living there. Maria E. said her friend would be living there, too. Defendant told Maria E. that he would not leave the house to her if her friend moved in. Maria E. said, if you do not want to do it the easy way, you can just go to jail.

Maria E. went into the bathroom and came out with box of make-up and perfume. She had a spot of blood on her forehead. Defendant asked her why she did this to herself and Maria E. said, "so you're going to jail." Defendant heard Maria E.'s friend, who was outside with Samuel, ask Maria E. what had happened and should they call the police. Defendant got angry and said, "you both can fuck yourselves." On many occasions, when they would argue, Maria E. would tell him to hit her so that he would go to jail and she would "get documents."

At no point in the conversation did defendant have a gun in his hand, threaten to kill Maria E. or strike her with a firearm.

Police arrived at the house two hours later. He was in a chair in front waiting. Defendant told a police officer that the methamphetamine they found was his. He told an officer he did not have any weapons; he had a plastic BB gun.

When Maria E. and defendant lived at the house, they did not have access to the garage. Defendant had been in the garage on two occasions when the owner asked him to help move items in and out of the garage.

Defendant denied that he sent the text messages on pages 11 through 15 in the packet Maria E. provided to police or that he ever sent Elizabeth messages to forward to Maria E.

Defendant did not intend to scare Maria E. with the text on page 3 that referenced the Bible. He had a new phone that would autocorrect, which is why there were things in

7

the message that he didn't understand. Defendant mistakenly sent the picture of guns on page 9, which he meant to send to some friends. In the text message on page 6, defendant meant that he would not look for Maria E. or his children anymore. In the reference to Hector and another, defendant meant that Maria E.'s family from Mexico was trying to get her to leave him because he was Salvadoran. On page 8, defendant was trying to say that Maria E. would suffer when he died from drinking too much and because she drank too much and so did the person she was or is with. On page 5, where defendant said he would send Maria E. and his children to eat shit, defendant said that this was something the phone did. Defendant meant that he planned to leave the country and they would be left without his support.

*Verdict and sentence*

The jury found defendant guilty of criminal threats based on the text messages, and criminal threats, assault with a firearm, domestic violence, possession of a firearm by a felon, and methamphetamine possession based on the January 30, 2018 incident. The jury found true that defendant personally used a firearm in the assault and criminal threat on January 30, 2018.

The trial court sentenced defendant to an aggregate term of 11 years four months in state prison as follows: the middle term of six years on the assault count, plus the middle term of four years for the firearm enhancement, and eight months for the text message criminal threats (one-third the midterm). The court imposed and stayed under section 654 sentences of two years for the criminal threats on January 30, 2018 (one-third the midterm), plus four years for the firearm enhancement, and the middle term of three years for domestic violence. Finally, the court sentenced defendant to eight months consecutive for firearm possession (one-third the midterm), and imposed no additional time for methamphetamine possession.

8

## DISCUSSION

### I

*Admitting Evidence of Prior Uncharged Incidents of Domestic Violence*

Defendant contends the trial court abused its discretion in admitting evidence of prior uncharged incidents of domestic violence, including rape, under Evidence Code section 1109, which he maintains "was more prejudicial than probative under [Evidence Code] section 352."

A. *Background*

The prosecution filed an in limine motion to admit prior uncharged acts of domestic violence defendant committed against Maria E. The evidence concerned the following incidents:

(1) In 2014, defendant wanted to have sex with Maria E. and, when she refused, he cut her on the leg with a kitchen knife.

(2) In 2015, defendant struck Maria E. multiple times in the arms and chest, resulting in bruises that showed up on a mammogram.

(3) In September 2016, Maria E. forgot to take their son to an extra class, which upset defendant. When Maria E. got home, defendant was drunk and swore at her. Defendant wanted to have sex to punish her and when she said, no, defendant forced her despite her begging him to stop.

(4) In November 2016, defendant came home drunk and demanded that Maria E. have sex with him. Defendant placed a handgun next to the bed where Maria E. could see it. Defendant forced Maria E. to have oral and anal sex despite her crying and begging him to stop.

(5) On December 20, 2016, Maria E. was unable to pick up cash wired by defendant's brother because of a misspelled name. Defendant accused her of lying. He was holding a gun and told her it would be bad for her unless she brought the money.

9

Maria E. felt particularly threatened because defendant had fired his gun in the house three different times.

(6) On December 28, 2016, when Maria E. and defendant were separated, defendant asked Maria E. to let the children spend New Year's Eve with him. After a week with him, defendant refused to give the children back. Defendant said that if she did not return home, he would have her beaten. He also threatened to have her deported. Defendant said that if she did not return to him the torture would begin, that he could kill her if he wanted to, and her family in Mexico would be killed.

(7) In early 2017, Maria E. returned to defendant for the sake of the children. In September 2017, Maria E. told defendant she was leaving again because he was violent, drinking and using drugs. Defendant became upset and threw her against the wall so hard it broke.

(8) On November 3, 2017, Maria E. noticed that defendant had been drinking beer when she came back to the house. He went to his truck and came back screaming at Maria E. that she was a traitor, and, with his face " 'twisted with anger,' " said this would cost Maria E. her life.

Defense counsel argued that uncharged claims of rape should not be admitted under Evidence Code section 352 because these were serious crimes that were not substantiated. Counsel stated, "I do agree than any prior acts of physical violence would be admissible under [Evidence Code section] 1109; however, there wasn't any investigation with regards to those rapes. There's no photographs. There's no reports."

The prosecutor responded that the evidence was relevant to Maria E.'s credibility regarding her belief in defendant's threats. The prosecutor argued that the probative value of the evidence was as at least as great as the prejudicial effect.

The trial court ruled that it would admit the 2014 and 2015 incidents under Evidence Code section 1109. The court also admitted the September 2016 incident as more probative than prejudicial but ordered that the evidence be "sanitize[d]," so that the

testimony did not mention the specific sex acts Maria E. was forced to engage in and simply stated that defendant forced her to have sex with him. The court excluded the November 2016 evidence as cumulative and unduly prejudicial because the September 2016 incident already introduced defendant's use of forced sex to intimidate Maria E. The court admitted evidence of the December 20 and 28, 2016 incidents to establish defendant's habit of carrying and using a firearm, which the September 2016 incident also established. The court observed that the December 28 incident further established that defendant made criminal threats to Maria E. The court also allowed evidence of the September 2017 incident. In sum, the court admitted evidence of every incident in the prosecutor's motion but required the September 2016 incident sanitized and excluded the November 2016 incident.

The court concluded, "with respect to the Defense's argument that there's no corroboration of the sexual assaults, I think that goes to weight, not admissibility. [¶] The Defense is free to cross-examine the witness with respect to the lack of any corroboration."

B. *Analysis*

Evidence Code section 1109 provides in relevant part, "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 352 requires the trial court to balance the probative value of evidence of past domestic violence against four factors: (1) the inflammatory nature of the prior conduct; (2) possible confusion of the issues; (3) remoteness in time of the prior offenses; and (4) the time involved in introducing and refuting the evidence of prior offenses. (*People v. Thomas* (2021) 63 Cal.App.5th 612, 630.)

"The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the

11

mechanical application of automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under [Evidence Code] section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. [Citations.] 'The [trial] court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value.' [Citation.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315.)

On the first factor, defendant argues that the charged crimes were not similar to the rape incidents and rape "is one of the most inflammatory crimes there is." However, the trial court admitted evidence of only one incident of forced sex in September 2016, which the court ordered sanitized so that there was no mention of any specific acts, and excluded evidence of the November 2016 incident. Moreover, in the January 30, 2018 incident, defendant pointed a gun at Maria E.'s head, pulled the slide back to cock the gun, told her the best thing would be for him to kill her, and then rammed the gun barrel into her forehead. Without attempting a comparison between these crimes, there can be no doubt that the evidence of the January 30, 2018 incident was extremely inflammatory.

On the second factor, possible confusion of the issues, defendant maintains that "the allegations were quite shocking and distracting to the jurors, and they were highly likely to wish to punish [defendant] for these uncharged acts." (See *People v. Kerley* (2018) 23 Cal.App.5th 513, 539 (*Kerley*) ["the concern is that a jury might convict a defendant to punish him for uncharged acts, rather than because the evidence is sufficient to prove the charged crime"].) However, evidence of uncharged offenses was not likely to mislead the jury because the court gave CALCRIM No. 852A, which instructed the jury that: "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also

12

conclude that the defendant was likely to commit and did inflict corporal injury upon Maria Doe, as charged here. . . . [¶] *Do not consider this evidence for any other purpose*." (Italics added.) We presume the jury followed this instruction. (*People v. Mani* (2022) 74 Cal.App.5th 343, 378, fn. 16.)

On the third factor, defendant concedes "that the prior acts were not particularly remote." On the fourth factor, consumption of time, defendant argues that this evidence took up 20 pages of the reporter's transcript. But that was a fraction of the hundreds of pages of transcript of testimony. Maria E.'s testimony alone ran to over 90 pages. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42 [evidence of uncharged crimes that consumed 27 percent of the reporter's transcript was not prejudicial].)

Beyond these factors, defendant argues that the "lack of certainty that each of these instances occurred also weighed against their admission," because "each of the acts of rape were uncharged, unreported, and unverified by any independent witness." In short, defendant argues that evidence of uncharged offenses was inadmissible because the evidence consisted of Maria E.'s testimony. However, it was up to the jury to determine what weight to give her testimony. As the jury was instructed, "[t]he testimony of only one witness can prove any fact." (CALCRIM No. 301.)

Defendant next asserts that the "cumulative nature of the prior acts evidence also weighed against admitting all of the prior acts." To the contrary, evidence that defendant committed multiple acts of domestic violence was more probative than one or two acts. The probative value of evidence of prior domestic violence " 'is principally in its cumulative nature.' " (*Kerley, supra*, 23 Cal.App.5th at p. 536.) "Evidence that [defendant] abused [the victim] multiple times is more probative than evidence that he did so once or twice . . . ." (*Ibid.*)

Lastly, defendant contends that the premise for admission of other acts of domestic violence under Evidence Code section 1109 was that domestic violence tended to escalate in severity and frequency, which was not the case here. We disagree that

13

defendant's pointing a gun at Maria E.'s head and telling that he was going to kill her was not an escalation from his other acts of domestic violence. In any event, there is no requirement in Evidence Code section 1109 that admissible evidence of acts of domestic violence show a pattern of escalation. True, the legislative history indicates that an escalating pattern of domestic violence was one of the concerns the Legislature addressed by adopting Evidence Code section 1109. (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) But the statute itself does not limit admissibility to only those uncharged acts that show such a pattern.

We conclude the trial court did not abuse its discretion in admitting evidence of defendant's prior uncharged acts of domestic violence under Evidence Code section 1109.

II

*Admitting Texts from Elizabeth*

Defendant contends that trial court erred in admitting screenshots of text messages from Elizabeth to Maria E. that contained messages said to be from defendant. Defendant claims that these messages were not authenticated and constituted inadmissible hearsay. We agree that these messages included hearsay but conclude their admission was not reversible error.

A.    *Background*

At the hearing on motions in limine, defense counsel raised the issue that "some of these text messages come from a person named Elizabeth, so clearly not messages from my client." A discussion ensued in which defense counsel argued that text messages from Elizabeth to Maria E. that relayed messages from defendant to Maria E. involved multiple levels of hearsay, lacked foundation without Elizabeth's testimony, and might violate the confrontation clause. The prosecutor argued that messages Maria E. believed were relayed from defendant by Elizabeth were relevant to the criminal threats charge and fell under the exception to the hearsay rule for party admissions. The prosecutor

14

confirmed to the trial court that the messages would be offered for their truth as well as Maria E.'s state of mind. The prosecutor's position was that Elizabeth was not making any statement but simply forwarding defendant's statements. The court responded, "She's just the conduit," and the prosecutor responded that, "It's almost like a translator. It doesn't constitute a layer of hearsay." The court still expressed concern that these messages were hearsay for which an exception to the hearsay rule would be required. The parties agreed that a hearing under Evidence Code section 402 would be appropriate to resolve the matter.

At the hearing, Maria E. testified that Elizabeth told her the messages were sent from defendant. Also, the messages sounded the same to Maria E. as messages she received directly from defendant. On cross-examination, Maria E. testified that the messages Elizabeth forwarded did not have a telephone number, so Maria E. could not verify that they were from defendant.

Defense counsel renewed her objection that text messages forwarded by Elizabeth lacked foundation and involved multiple levels of hearsay.

The court ruled that, under Evidence Code section 1421, the text messages were authenticated by content, including "unique references to the Bible, threats to Maria's family, and references to violent stories in the family . . . ." The court noted that Maria E. testified that Elizabeth told Maria E. that Elizabeth would send messages from defendant and the content of the messages was similar to previous messages sent by defendant directly. Maria E.'s inability to verify that the messages came from defendant went to the weight not admissibility of the evidence. For these reasons, the court concluded the messages were self-authenticated.

Lastly, the court said: "So to the extent these may have come from Elizabeth -- and I'm not entirely convinced she even wrote any of it. She's just the CONDUIT -- it's similar to I write a note. The bailiff picks it up, hands it to my courtroom clerk. He's just the conduit. [¶] Similarly, I think Elizabeth was simply a conduit for that

15

communication, so I don't think there's multiple levels of hearsay. [¶] And to the extent these are messages from the defendant, it qualifies as an exception to the hearsay rule as a party admission."

B.     *Analysis*

An out-of-court statement offered for its truth is inadmissible under the hearsay rule, unless there is an applicable exception to the rule. (Evid. Code, § 1200.) Admission of multiple hearsay requires all layers to fall within an exception to the hearsay rule. (Evid. Code, § 1201; *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 366; *People v. Williams* (1997) 16 Cal.4th 153, 199, fn. 3.) We review a trial court's determination as to the admissibility of evidence for abuse of discretion, including the application of exceptions to the hearsay rule. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.) A trial court's ruling will not be disturbed unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

The messages from Elizabeth included two levels of hearsay: (1) the text messages from defendant incorporated in (2) the text messages from Elizabeth to Maria E. Assuming that the text messages from defendant qualified for the hearsay exception for party admissions (Evid. Code, § 1220), no exception was proposed for Elizabeth's messages. Instead, the court deemed Elizabeth a mere "conduit" for defendant's messages and thus her messages did not add another layer of hearsay.

The court's repeated use of the term "conduit," as well as the prosecutor's comparison of Elizabeth to a "translator," are telling. In *Correa v. Superior Court* (2002) 27 Cal.4th 444, 448, the California Supreme Court recognized the " 'language conduit' " theory. In *Correa*, the high court held that the participation of a translator in an out-of-court interview does not add a layer of hearsay. "Rather, a generally unbiased and adequately skilled translator simply serves as a 'language conduit,' so that the translated statement is considered to be the statement of the original declarant, and not that of the

16

translator." (*Ibid.*) The court adopted the Ninth Circuit's test in *U.S. v. Nazemian* (9th Cir. 1991) 948 F.2d, 522, 527, which requires consideration of several factors, " 'such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated.' " (*Correa*, at p. 458.)

The " 'language conduit' " theory does not apply here, nor are we aware of any authority for a similar theory of general application. The language conduit exception is based on the recognition that a qualified language interpreter (like a certified court reporter) is trained to remove themselves from the equation and operate as a pure conduit or agent of the declarant. Absent a translator relationship, an out-of-court statement of one declarant passing along the out-of-court statement of another declarant is a classic multiple-hearsay scenario. To argue otherwise by asserting that the second declarant directed the first declarant to convey his or her statements or intended them to be conveyed amounts to circumvention of the requirement that every level of hearsay must fall within a recognized exception. (Evid. Code, § 1201; *Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 609 ["[h]earsay evidence is generally . . . inadmissible without statutory or decisional authorization"].)

Moreover, as defendant points out, at least in part, the foundation for this evidence consisted of hearsay. Maria E. testified that Elizabeth told her that the messages were from defendant. The trial court referenced this testimony in ruling that the text messages from Elizabeth were self-authenticated. No exception to hearsay rule was proposed for these out-of-court statements.

However, we agree with the Attorney General that the admission of this evidence was harmless error. We review the erroneous admission of hearsay evidence under the standard stated in *People v. Watson* (1956) 46 Cal.2d 818, 836, whether it is "reasonably probable that the error affected the outcome of the trial." (*People v. Harris* (2005)

17

37 Cal.4th 310, 336.) In highlighting the evidence supporting the criminal threat charge based on defendant's text messages, the prosecutor only referred to text messages that defendant sent directly to Maria E., including the photo of guns (which the prosecutor called "the most clear, an unquestionable threat that was sent by the defendant," as well as the texts where "defendant told Maria to go fuck herself," and "[i]t doesn't matter where I am. I have run out of patience, and you will suffer death." None of these three threats were conveyed in the text messages from Elizabeth. (See *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 423-424 [extent that counsel relies on inadmissible evidence in closing argument is a relevant factor in determining prejudice from introduction of inadmissible evidence].)

In light of the prosecutor's emphasis in closing argument to the jury on inflammatory text messages such as these from defendant, it is not reasonably probable that the presentation of inadmissible hearsay in the form of text messages from Elizabeth affected the outcome of the trial.

III

*Sufficiency of Evidence—Felon in Possession of a Firearm*

Defendant contends that there was insufficient evidence to support his conviction of possession of a firearm by a felon.

" 'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' [Citation.] 'This standard of review applies when the evidence is largely circumstantial . . . .' [Citation.]" (*People v. Hardy* (2018) 5 Cal.5th 56, 89.) We "presume the existence of every fact that the jury could reasonably have deduced from [the] evidence." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 488.) A verdict will be reversed for lack of evidence only if " 'upon no hypothesis whatever is there sufficient substantial evidence to

support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

The firearm possession statute prohibits a felon from "possess[ing]" a firearm or having a firearm "under custody or control." (§ 29800, subd. (a)(1).) "Possession may be actual or constructive. ' "A defendant has actual possession when the weapon is in his [or her] immediate possession or control," ' i.e., when he or she is actually holding or touching it. [Citations.] 'To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person.' [Citations.] Although a defendant may share possession with other people, 'mere proximity' or opportunity to access the contraband, 'standing alone, is not sufficient evidence of possession.' " (*People v. Bay* (2019) 40 Cal.App.5th 126, 132.) But " 'the necessary additional circumstances may, in some fact contexts, be rather slight.' " (*People v. Land* (1994) 30 Cal.App.4th 220, 225.)

There was substantial evidence in this case supporting the jury's verdict that defendant had constructive possession of the firearm in the garage. Police found the Glock handgun hidden in the detached garage under a pile of wood. Maria E. testified the side door to the garage was unlocked and it was open when the police searched the garage. Maria E. also testified that defendant had gone inside the garage when the owners were not there. Rivas denied that the owners owned any guns or stored any guns in the garage. Any gun found in the garage would not belong to the owners. The jury could infer from the testimony of Maria E. and a police officer that a gun in the photograph defendant texted to Maria E. looked like the gun found in the garage that this gun was in fact one of the guns in the photograph. The jury could infer from Maria E.'s testimony that defendant always had guns, she did not know where defendant kept his guns, and police found a gun in the garage, not the house, that defendant kept his gun in the garage. The jury, on the other hand, was entitled not to credit defendant's explanation that he texted the photo of alcohol and guns to Maria E. by mistake, i.e., that he took a picture of a friend's guns that he sent to contact groups, and Maria E. was in one of the

19

groups. On cross-examination, defendant conceded that the message was sent only to Maria E., not a group. Similarly, the jury could infer possession from the gun being found in a holster that matched the picture on a box in defendant's trash can. The jury was entitled to disbelieve defendant's statement to the police that he found the box in the front yard.

The evidence was sufficient to support the jury's finding that defendant had constructive possession of the Glock handgun found in the garage.

IV

*Cumulative error*

Defendant contends that his conviction should be reversed because cumulative error denied his right to due process. Since we have rejected his claims of error, save for a single error that we found to be nonprejudicial, we find no error to accumulate and no cumulative prejudice to defendant, and therefore reject defendant's claim that cumulative error denied him due process. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1094.)

**DISPOSITION**

The judgment is affirmed.


                                              /s/
                                       RAYE, P. J.


We concur:



      /s/
BLEASE, J.



      /s/
KRAUSE, J.


20